## THE JAMES A. LAWRENCE and THE COMANCHE.

### FLOAT NO. 1.

#### (District Court, S. D. New York.   October 31, 1899.)

COLLISION—STEAMERS CROSSING—LOOKOUT—CHANGE OF COURSE.

An incoming steamer, bound up East river, which took a diagonal course across the river, and across the course of a tug with a tow crossing from Brooklyn, and having the right of way, when by the rules and state statutes she was required to keep to the right and as near the middle of the river as might be, *held* in fault for a collision with the tow. The tug also *held* in fault for failing to keep a proper lookout, and for changing her course.

In Admiralty.   Cross libels for a collision between the steamship Comanche and Float No. 1, in tow of the tug James A. Lawrence.

Black & Kneeland and Bowers & Sands, for the Car Float No. 1.

Goodrich, Whitney & Hagen, for the Lawrence.

Robinson, Biddle & Ward, for the Comanche.

BROWN, District Judge.   The collision in the above cases occurred about 4 o'clock in the morning of December 30, 1897, about 300 feet off South Ferry.   The Comanche was coming in from sea and bound up the East River.   At the moment of collision she was about in line with the New York shore off South Ferry, and struck the Float No. 1, in tow of the steamtug Lawrence, on her port side at nearly right angles, the float then heading nearly directly on shore, or a little to the westward.   The stem of the Comanche penetrated the forward part of the float about 16 inches, while the forward motion of the float carried the Comanche's stem somewhat over to port. The tide was strong ebb, the weather clear, excepting a little haze upon the water.   The float had left Woodruff's Stores on the Brooklyn side near Montague street, and was going around the Battery to the Erie Railroad docks at Jersey City.   The Comanche was bound for pier 29 East river, just below the Brooklyn Bridge.

The evidence as to the time when the vessels were seen by each other and as to their lights and signals, is extremely confused and uncertain.   I think a proper lookout was not maintained on either vessel.   The Comanche's lookout was changed at about that time—a fruitful occasion of collisions; and the Lawrence had no separate lookout proper, but only the mate who was directing the navigation

from the top of the float, which obscured the view of the pilot in the pilot house of the tug. The Comanche had come past Ft. William about 300 yards off, and according to the statement of her master, shaped her course for about the middle of the Brooklyn Bridge, which would carry her near the New York shore. She proceeded over to near the New York shore and then ported two or three points. A straight course of the Lawrence with her float would likewise take her near South Ferry. The rule of the road, as well as the state statute of New York, required the Comanche to keep to the right, and as near the middle of the river as may be; while the starboard-hand rule required the Comanche to keep out of the way of the tug and float. There was nothing to prevent the Comanche from keeping out of the way of the tug and float, as well as of the ferryboat and the other tug, by going to the right of the middle of the river, instead of continuing her course across that of all these vessels. Contrary signals were sounded when the tug was only a few hundred yards distant. I am not satisfied of the alleged early giving of one whistle by the Comanche to the Lawrence; it is denied by the officers and none such was heard by Clapper or Vandecar on the Depew; and the actual navigation of the Comanche indicates the contrary. I cannot accept, however, the excuses suggested for the Comanche's not seeing the lights of the Lawrence earlier, and giving timely signals. The attempt to cross the bows of the tug and float and go to the left, in violation of the rules and statutes, is sufficient to charge the steamer with fault.

I think the tug must also be held to blame for not maintaining a good lookout, and for not keeping her course, as the rules required. Her helm was put hard to port and she also reversed, and the combined effect of both was to swing her to starboard at about right angles from her previous course. It seems to me impossible that the tug could have done this with so cumbersome a tow as a loaded float 200 feet long on her port side, unless this change of helm had been made some time before the collision. At the time of the collision the tug and float must have been moving ahead with some speed, or the stem of the steamer would not have been carried to port. The master's intimation (he does not state definitely) of the distance in which the tug and float could be stopped, is I think erroneous and misleading. The tug by her swing to starboard some six or seven points, must have run in a considerable distance towards the shore. This was in direct violation of the present rule requiring the privileged vessel to keep her course. The necessary inference is that but for this change of course, the float being struck only about 16 feet aft of her forward port corner, the collision would have been avoided, notwithstanding the Comanche's fault. A change of six or seven points by a cumbersome float of such size, is too great and occupies too much time to be considered as made in extremis; and I must, therefore, treat the tug as also in fault. The float not being shown to be in fault, the damages should be apportioned between the tug and the steamer, without touching upon the many contradictions and obscurities which the case otherwise presents.